OPINION
{¶ 1} Michael A. Galluzzo was convicted by a jury in the Champaign County Court of Common Pleas of two counts of non-support of dependents, in violation of R.C. 2919.21(A)(2), and two counts of non-support of dependents, in violation of R.C.2919.21(B). He was sentenced to five years of community control and ordered to pay a fine of $100 on each count, to be served concurrently.
 {¶ 2} The procedural history of this case is long and complex.
 {¶ 3} On August 16, 2001, Galluzzo was indicted for one count of non-support of dependents, in violation of R.C. 2919.21(A)(2), and one count of non-support of dependents, in violation of R.C.2919.21(B), both felonies of the fifth degree. The non-support was alleged to have occurred for the period of January 1998 through June 2001. Galluzzo was served with the indictment on August 31, 2001. He remained free on a personal recognizance bond, and a jury trial was scheduled for January 24, 2002.
 {¶ 4} On October 10, 2001, Galluzzo requested a three week extension to file pretrial defense motions, which was granted on October 12, 2001. On December 19, 2001, Galluzzo filed a motion for recusal, arguing that the trial judge had entered rulings in the related domestic relations case, that the judge would likely be called as a witness at trial, and that the magistrate of the court would likely be called in a civil action in federal court, which had been filed on April 27, 2001. On January 10, 2002, Galluzzo requested an order to stay the proceedings and continue the trial pending disposition of his civil lawsuit in federal court and pending a disposition by the supreme court regarding his affidavit of bias. On January 22, 2002, the court denied the motion for recusal and granted the motion to stay. The court indicated that it would next give consideration to the case after the federal court had ruled on Galluzzo's action. The court noted that the federal magistrate judge had recommended dismissal of the federal case.
 {¶ 5} On March 23, 2004, the court ordered a status conference, which was delayed until April 7, 2004, at the request of defense counsel. On April 11, 2004, the court issued a journal entry in which it noted that the federal action had been dismissed on January 23, 2004 and that Galluzzo had filed an appeal to the Sixth Circuit on March 1, 2004. The court indicated that the state had requested a trial forthwith; conversely, Galluzzo had requested that the court await completion of the federal appeal or, at least, that trial not be scheduled until August 2004. The court found that the notice of appeal did not operate as an automatic stay of the federal trial court's decision nor as a stay of the proceedings in the common pleas court. Thus, the court "determined that trial would not be set in this court for at least sixty days in order for Mr. Galluzzo to seek either a stay of these proceedings or a stay of the effect of the District Court's decision." The court set a new trial date of June 28, 2004.
 {¶ 6} On June 14, 2004, the state and Galluzzo jointly filed a statement of intent, indicating that there had been a defect in the indictment and that Galluzzo had agreed to waive his right to a grand jury and had consented to enter a plea of not guilty to a bill of information. The bill of information added four counts to the two counts originally stated in the indictment — two counts of non-support of dependents in violation of R.C. 2919.21(A)(2) and two counts of non-support of dependents in violation of R.C.2919.21(B). Counts three and four mirrored the allegations in the original indictment. Counts five and six were based on Galluzzo's non-support of dependents between July 2001 and June 2004.
 {¶ 7} On the same day, Galluzzo filed an affidavit to disqualify the trial judge with the Supreme Court of Ohio. Three days later, the Chief Justice of the Supreme Court of Ohio denied the affidavit of disqualification and ordered that the case proceed before Judge Wilson.
 {¶ 8} On June 21, 2004, Galluzzo was arraigned before the court, during which he waived his right to an indictment and pled not guilty to the charges in the bill of information. Trial was rescheduled for August 23, 2004.
 {¶ 9} On August 17, 2004, Galluzzo sought to dismiss the counts alleged in the indictment, arguing that they had been superceded by counts three and four of the bill of information which included the same dates and the same charges. Galluzzo further argued that he had already been held in contempt for failing to pay child support between January 1998 and June 2001 and, thus, counts three and four should be dismissed under the Double Jeopardy Clause. The state agreed that counts one and two in the indictment were replaced by counts three and four in the bill of information. On August 19, 2004, the trial court dismissed counts one and two (the two counts in the indictment). It denied Galluzzo's motion to dismiss counts three and four, finding that the contempt was civil in nature, that Galluzzo had the opportunity to purge the contempt, and that the subsequent punishment did not convert the civil contempt to a criminal contempt.
 {¶ 10} On August 20, 2004, Galluzzo sought dismissal of counts three and four due to a speedy trial violation. Alternatively, he requested a stay of the proceedings pending the outcome of his appeal to the Sixth Circuit. On August 23, 2004, Galluzzo sought dismissal of all of the criminal charges on the ground that he was improperly classified as a noncustodial parent and obligor for the payment of child support. These motions were overruled.
 {¶ 11} A jury trial commenced on August 23, 2004, on the four counts alleged in the bill of information. The jury found Galluzzo guilty on all counts, and he was sentenced accordingly.
 {¶ 12} Galluzzo appeals from his convictions, raising eight assignments of error.
 {¶ 13} I. "THE TRIAL COURT ERRED WHEN IT DENIED THE APPELLANT'S MOTION FOR RECUSAL."
 {¶ 14} In his first assignment of error, Galluzzo claims that the trial court erred when the trial judge failed to recuse himself from the case.
 {¶ 15} R.C. 2701.03 sets forth the procedures for seeking disqualification of a common pleas court judge for prejudice. Under that statute, a party may file an affidavit of disqualification with the clerk of the supreme court. The Chief Justice of the Supreme Court of Ohio or his designee determines whether the judge is biased or prejudiced. Callison v. DuPuy,
Miami App. No. 2002 CA 52, 2003-Ohio-3032, ¶ 22, citing Beer v.Griffith (1978), 54 Ohio St.2d 440, 441, 377 N.E.2d 775 and Section 5(C), Article IV, Ohio Constitution. This procedure provides "the exclusive means by which a litigant may claim that a common pleas judge is biased and prejudiced." Jones v.Billingham (1995), 105 Ohio App.3d 8, 11, 663 N.E.2d 657.
 {¶ 16} Here, Galluzzo filed an affidavit of disqualification with the supreme court, and it was denied by the Chief Justice. We have no authority to review the issue of the trial judge's alleged bias and prejudice.
 {¶ 17} The first assignment of error is overruled.
 {¶ 18} II. "THE TRIAL COURT ERRED WHEN IT DENIED THE APPELLANT'S MOTION TO DISMISS COUNTS FOUR AND SIX."
 {¶ 19} In his second assignment of error, Galluzzo claims that the trial court erred when it failed to dismiss counts four and six of the bill of information, which alleged violations of R.C. 2919.21(B). Galluzzo argues that the child support order upon which those counts were based was constitutionally infirm. Specifically, Galluzzo asserts that Ohio's statutory scheme for awarding custody violated his procedural due process rights. In response, the state contends that Galluzzo may not collaterally attack the support order in this proceeding and that his remedy was a direct appeal of that order.
 {¶ 20} We agree with the state. The orders establishing custody and setting forth Galluzzo's child support obligations were final and appealable. The appropriate procedure to challenge those orders was a direct appeal of those orders, and Galluzzo's failure to do so constituted a waiver of any error. Although a void judgment may be subject to collateral attack in another proceeding, e.g., In re Ramsey (1956), 164 Ohio St. 567,571-72, 132, N.E.2d 469, there is no basis to conclude that the court of common pleas acted outside of its jurisdiction when it entered the domestic relations orders at issue. Consequently, Galluzzo could not have properly collaterally attacked the child support order in the trial court. Accordingly, the trial court did not err when it denied Galluzzo's request to dismiss counts four and six.
 {¶ 21} The second assignment of error is overruled.
 {¶ 22} III. "THE TRIAL COURT ERRED WHEN IT DENIED THE APPELLANT'S MOTION TO DISMISS BASED UPON A SPEEDY TRIAL VIOLATION."
 {¶ 23} In his third assignment of error, Galluzzo claims that he did not validly waive his right to a speedy trial and that the trial court erred when it refused to dismiss counts three and four of the bill of information. Galluzzo states that his waiver was premised on the belief that his trial would not occur until the completion of his federal lawsuit, including any appeals. The state responds that Galluzzo never, in fact, waived his speedy trial rights because he was brought to trial within the statutory 270-day time period.
 {¶ 24} "The right to a speedy trial is guaranteed by theSixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution. In Ohio, R.C. 2945.71
requires the State to bring a felony defendant to trial within two hundred and seventy days of arrest. R.C. 2945.71(C). Each day during which the accused is held in jail in lieu of bail on the pending charge is counted as three pursuant to the triple-count provision of R.C. 2945.71(E)." State v. Hart, Montgomery App. No. 19556, 2003-Ohio-5327. Under R.C. 2945.72, the speedy trial time may be tolled during any period of delay "necessitated by reason of a * * * motion, proceeding, or action made or instituted by the accused." R.C. 2945.72(E).
 {¶ 25} In the hearing on January 15, 2002, Galluzzo's counsel made the following statements:
 {¶ 26} "First, I consulted with Mr. Galluzzo after the last hearing on the 11th and there have been some discussion at that hearing relative to the motion for continuance as to the speedy trial considerations involved; and I'm prepared to remove that issue to the extent it's there at all anymore by tendering to the Court * * * that Mr. Galluzzo waives his right to speedy trial in this matter.
 {¶ 27} "And I've discussed with him that he has a right to have the matter tried within 270 days under the law, and he understands that is not only a statutory right but the statute actually is the mechanism for his constitutional right for speedy trial.
 {¶ 28} "And understanding that he has agreed that he waives that. Am I correct?"
 {¶ 29} Galluzzo responded in the affirmative. There is no indication in the record that Galluzzo conditioned his expressed waiver on the court's continuing the trial date and staying the proceeding until the federal action had been concluded, including any appeals from adverse rulings.
 {¶ 30} Regardless, we agree with the state that Galluzzo was ultimately tried within the 270-day statutory period required by R.C. 2945.71. Here, the speedy trial time began to run on August 31, 2001, when Galluzzo was served with the indictment. State v.Riley, 162 Ohio App.3d 730, 735, 2005-Ohio-4337, 834 N.E.2d 887, at ¶ 20. On December 19, 2001, Galluzzo filed a motion for recusal, which tolled the speedy trial time. Because Galluzzo remained free on bond, the period between August 31 and December 19, 2001 counted toward his speedy trial time on a one-to-one basis, for a total of 110 days.
 {¶ 31} On January 10, 2002, while his motion for recusal remained pending, Galluzzo requested that trial date be rescheduled and sought a stay of the proceedings pending the outcome of his federal litigation. The trial court granted the motion for stay on January 22, 2002. On March 23, 2004, the court ordered a status conference; that conference was delayed at Galluzzo's request until April 7, 2004. Because Galluzzo had filed motions resulting in the delay of proceedings between December 19, 2002 and April 7, 2004, when the stay was lifted, that extended time period did not count toward Galluzzo's speedy trial time.
 {¶ 32} Trial was scheduled for August 23, 2004, 137 days after the stay was lifted. As noted by the state, shortly before the scheduled trial date, Galluzzo filed three motions to dismiss. In addition, in June 2004, Galluzzo had filed an affidavit of disqualification with the Supreme Court of Ohio, which was denied three days later. The result of these motions was the tolling of eight days during the period between April 8, 2004, and August 23, 2004, when the trial commenced. Consequently, for speedy trial purposes, 111 days had passed prior to the stay and 129 had passed subsequent to the lifting of the stay, for a total of 240 days. Accordingly, Galluzzo was tried within 270 days of the service of the indictment, as required by R.C. 2945.71(C)(2).
 {¶ 33} The third assignment of error is overruled.
 {¶ 34} IV. "THE TRIAL COURT ERRED WHEN IT SENTENCED APPELLANT IN VIOLATION OF THE DOUBLE JEOPARDY CLAUSE."
 {¶ 35} In his fourth assignment of error, Galluzzo contends that the court's imposition of a sentence on counts three and four of the bill of information violated the Double Jeopardy Clause, because he had previously served a thirty-day sentence after the court had cited him for contempt for the third time on April 26, 2001. Galluzzo indicates that the contempt citation covered the period of time also covered by counts three and four. Galluzzo acknowledges that we have held that "the service of a previously suspended sentence upon the defendant's noncompliance with the conditions of the suspension does not change the nature of the original contempt from civil to criminal for double jeopardy purposes." State v. Montgomery, Montgomery App. No. 20036, 2004-Ohio-1699, following State v. Palmer, Montgomery App. No. 19921, 2004-Ohio-779.
 {¶ 36} We most recently discussed the relationship between contempt proceedings and prosecution for non-support of dependents in Montgomery, supra, as follows:
 {¶ 37} "The Double Jeopardy Clause in the Fifth Amendment to the United States Constitution and Section 10, Article I, of the Ohio Constitution prohibits subjecting defendants to successive prosecutions for the same offense. State v. Lovejoy,79 Ohio St.3d 440, 443, 1997-Ohio-371; State v. Mobley (Oct. 11, 2002), Montgomery App. No. 19176. Double jeopardy protections apply in cases involving contempt charges, but only if the contempt is criminal in nature, rather than civil. Id.; Dayton Women'sHealth Ctr. v. Enix (1991), 68 Ohio App.3d 579, 591,589 N.E.2d 121. Criminal contempt is a lesser included offense of felony non-support of dependents per R.C. 2919.21(B). Therefore, a prior criminal contempt finding for failure to pay child support bars, on double jeopardy grounds, a subsequent prosecution for felony non-support of dependents per R.C. 2919.21(B). Mobley, supra.
 {¶ 38} "There are two types of contempt, civil and criminal. Sanctions for criminal contempt are punitive in nature and unconditional. They are intended to punish the offender for past disobedience of a court order and vindicate the authority of the court. Civil contempt sanctions, on the other hand, are remedial and are intended to coerce the contemnor into complying with the court's order. In civil contempt the punishment is conditional and the contemnor has an opportunity to purge himself of the contempt and avoid the punishment by complying with the court's order. The contemnor carries the keys of his prison in his own pocket, because he can avoid or terminate the punishment if he agrees to do as ordered by the court. Brown v. Executive 200,Inc. (1980), 64 Ohio St.2d 250, 416 N.E.2d 610.
 {¶ 39} "The distinction between civil and criminal contempt was explained by this court in Shapiro v. Shapiro (November 18, 1994), Miami App. No. 94-CA-2:
 {¶ 40} "`The distinction between civil and criminal contempt turns on the character and purpose of the sanction imposed. Either a fine or imprisonment, or both, may be imposed in civil or criminal contempt cases. In the civil context, however, the purpose of the sanction is coercive: that is, it is intended to force the contemnor to comply with the court's order. Compliance, in turn, redounds to the benefit of the civil complainant. SeeBrown v. Executive 200, Inc. (1980), 64 Ohio St.2d 250
[18 O.O.3d 446]. A sanction for civil contempt must allow the contemnor to purge himself of the contempt. Tucker v. Tucker
(1983), 10 Ohio App.3d 251, 461 N.E.2d 1337. Once the contemnor chooses to comply with the court's order, the purpose of the sanction is achieved and the sanction is discontinued.
 {¶ 41} "`A sanction for criminal contempt, by contrast, is a punishment for past refusal to obey a court order. Schrader v.Huff (1983), 8 Ohio App.3d 111, 456 N.E.2d 587. No coercive element is present. `Sentences for criminal contempt are punitive in nature and are designed to vindicate the authority of the court.' State v. Kilbane (1980), 61 Ohio St.2d 201, 205
[15 O.O.3d 221].'" Montgomery at ¶ 17-21.
 {¶ 42} In Palmer, we held that the imposition of one day of incarceration out of a ten day suspended sentence for contempt remained civil in nature, and thus double jeopardy did not apply to his subsequent prosecution for felony non-support of dependents. We reasoned:
 {¶ 43} "[B]ecause the incarceration occurred as a result of [Palmer's] noncompliance with a civil contempt order, the incarceration was civil in nature. As aptly put by the Birch
court: `The fact that the sentence came to be subsequently imposed was not so much a result of the court's action, as it was a result of [the defendant's] decision.' 2002-Ohio-3734, ¶ 16. Palmer's decision not to pay the monthly support, i.e., his `decision not to purge the contempt[,] did not cause the sentence of the court to change from civil to criminal; it did not cause the sentence to become punitive.' Id. Although Palmer could not purge the one day incarceration while in jail, he had held the keys to the jailhouse door and had previously decided not to use them."
 {¶ 44} In Montgomery, the defendant was found in contempt of his child support order on numerous occasions. After receiving a suspended sentence on several occasions, the court ordered the defendant to serve forty-four days in jail. The court also stated that upon his payment of $600 on the arrears and after he had served ten days in jail, the defendant's attorney could file a motion for the court's consideration for Montgomery's early release. Montgomery paid the $600 and served ten days in jail. The remaining thirty-four days were suspended by the court. Following Palmer, we concluded that Montgomery's service of the previously suspended sentence was not criminal in nature. Thus, we concluded that double jeopardy did not apply.
 {¶ 45} Upon review of the record, we find that Galluzzo's contempt citation is distinguishable from that in Palmer andMontgomery. Here, the court indicated that "[u]pon completing the sentence or paying the child support arrearage in full,whichever occurs first, the Obligor will have purged the contempt citation from the Journal Entry of January 29, 1998." (Emphasis added). In other words, Galluzzo could have purged the thirty-day jail term during the course of his incarceration by paying his arrearage. Because Galluzzo had the keys to the jailhouse door during his incarceration, the contempt citation — which was clearly civil when it was imposed — unquestionably remained civil when he was required to serve the suspended sentence. Double jeopardy thus did not apply.
 {¶ 46} In light of the fact that the present circumstance is distinguishable from Palmer and Montgomery, we decline to reconsider the wisdom of our earlier decisions at this time.
 {¶ 47} The fourth assignment of error is overruled.
 {¶ 48} V. "THE TRIAL COURT ERRED WHEN IT REFUSED TO HONOR THE SUBPOENA ISSUED BY THE APPELLANT."
 {¶ 49} In his fifth assignment of error, Galluzzo claims that the trial court improperly refused to honor his subpoena of the trial judge. Galluzzo argues that he "wished to challenge the court order by attacking the fairness of the procedure by which it was created and maintained. The trial court, by refusing to honor the subpoena, precluded much of the Appellant's defense." Galluzzo asserts that the trial court's refusal violated his right under the Compulsory Process Clause of the Sixth Amendment, as incorporated by the Fourteenth Amendment, to secure the testimony of witnesses in his favor.
 {¶ 50} "The Sixth Amendment to the United States Constitution establishes a defendant's right to compulsory process. It provides, in relevant part, that `[i]n all criminal prosecutions, the accused shall enjoy the right * * * to have compulsory process for obtaining witnesses in his favor.' Article I, Section10, of the Ohio Constitution similarly affords a defendant the right to compulsory process. * * * Our cases establish, at minimum, that criminal defendants have the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt.'" State v.Buhrman (Step. 12, 1997), Greene App. No. 96 CA 145. "The accused's right to call witnesses in his favor is not without limit, however. Upon a challenge, the accused must make some plausible showing of how the testimony would have been material and favorable to his defense." State v. Brown (May 13, 1991), Stark App. No. CA-8338, citing U.S. v. Valenzuela-Bernal
(1982), 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193.
 {¶ 51} On August 23, 2004, the court reiterated for the record the decisions that it had made during a telephone conference on August 20, 2004. Regarding the subpoena, the court stated:
 {¶ 52} "More difficult for the Court i[n] some ways was dealing with the subpoena that was issued. The Court found that the subpoena would not require Judge Wilson to testify. The Court found that the questions of disqualification of Judge Wilson from presiding over the trial have been resolved by Defendant's application to the Supreme Court. And the Supreme Court ruling found that the subpoena was another method to seek disqualification of the Judge for this particular case.
 {¶ 53} "The Court found that there is no basis for determining that the Judge would be a material witness which has no material information to provide, it is all a matter of record. There is not any record of various cases, but there is ample sources for providing whatever information Counsel and the Defendant might seek to provide from the Judge as a witness.
 {¶ 54} "The Court finds that Canon 2 and Evidence Rule 605 deal with the question of who can serve as a witness. The Court finds that Canons 3C deals indeed, deals with disqualification of judge as does State Constitution.
 {¶ 55} "The Court believes that fairness to both sides in the case does not require that Judge Wilson appear as a witness."
 {¶ 56} The court again memorialized its ruling in a journal entry on September 30, 2004.
 {¶ 57} Upon review, we find no fault with the trial court's determination to quash the subpoena of Judge Wilson. As stated supra, Galluzzo could not collaterally attack the support order as part of this criminal proceeding, and we find no basis to conclude that Judge Wilson had any material information to provide. Under the circumstances presented, Galluzzo's rights under the Compulsory Process Clause were not violated.
 {¶ 58} The fifth assignment of error is overruled.
 {¶ 59} VI. "THE TRIAL COURT ERRED WHEN IT FAILED TO INSTRUCT THE JURY AS TO THE PRESUMPTION OF INNOCENCE AND REASONABLE DOUBT AFTER THE PARTIES' CLOSING ARGUMENTS."
 {¶ 60} In his sixth assignment of error, Galluzzo asserts that the trial court erred when it failed to instruct the jury fully after the completion of closing arguments.
 {¶ 61} Galluzzo relies upon State v. Comen (1990),50 Ohio St.3d 206, 553 N.E.2d 640. In Comen, the Supreme Court of Ohio looked to Crim.R. 30(A), which then stated that "* * * the court shall instruct the jury after the arguments are completed." The Court found that the language in the rule was mandatory, and that if "preliminary or cautionary instructions include matters of law vital to the rights of a defendant, the trial court is not excused from including or repeating all such instructions after the arguments are completed." Id. at 209. The Court thus held that "[a]fter arguments are completed, a trial court must fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." Id. at 210. In that case, however, the Court found the failure to repeat such instructions to have been harmless.
 {¶ 62} In State v. Ransby (July 17, 1998), Montgomery App. No. 16138, we contrasted the pre-1992 version of Crim.R. 30 with the then-current version.[1] Noting that the language in the 1998 version required only that the court "give" the jury instructions after the arguments are completed, we stated that there was "no reason to think that providing the jury with the complete instructions in written form does not fulfill the requirements of the current rule." We further found no prejudice to the defendant as a result of the court's failure to repeat all of the relevant jury instructions orally.
 {¶ 63} On reconsideration, we reiterated that where the court fails to provide complete instructions following closing arguments, the defendant must preserve the error by making an appropriate motion after closing arguments that the court reinstruct the jury or by objecting to the court not doing so.State v. Ransby (May 28, 1999), Montgomery App. No. 16138; see Crim.R. 30(A). We found no plain error, noting, in part, that there was no contention that the jury was not properly instructed prior to hearing closing arguments and that the written instructions correctly stated the instruction at issue.
 {¶ 64} In the present case, Galluzzo did not request that the court read the jury instructions in their entirety, nor did he object to the court's failure to do so at the conclusion of the reading of the jury instructions. Consequently, we review the court's failure to do so for plain error.
 {¶ 65} Here, the court provided each of the jurors with a written copy of the jury instructions at the conclusion of the closing arguments so that they could read along silently as the court gave its instructions. The court began by noting that the trial date on the first page had been changed to reflect a two day trial. Although the court did not read the jury instructions verbatim, it reminded the jurors of all of the instructions that had previously been read. Specifically, it summarized that the burden of proof and reasonable doubt had been defined on page two, that page three informed the jurors of what evidence is and the difference between direct and circumstantial evidence, that page four explained credibility and the jury's role in considering the witnesses' credibility, and that the first paragraph of page five explained exhibits and that the jury determines the weight to be given to those exhibits. The further court provided each juror with a complete written copy of the jury instructions for his or her use during deliberations. We see no prejudice to Galluzzo from the court's instructions, and the court's actions did not rise to the level of plain error.
 {¶ 66} The sixth assignment of error is overruled.
 {¶ 67} VII. "THE JURY'S VERDICTS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 68} In his seventh assignment of error, Galluzzo contends that his convictions were against the manifest weight of the evidence. Specifically, Galluzzo challenges the jury's finding that there was a valid support order and its rejection of his affirmative defense.
 {¶ 69} When a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."Thompkins, 78 Ohio St.3d at 387, citing State v. Martin
(1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility. State v. Lawson
(Aug. 22, 1997), Montgomery App. No. 16288. "Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion." Id. A judgment should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. Martin,20 Ohio App.3d at 175.
 {¶ 70} According to the state's evidence, Teresa and Michael Galluzzo were married on August 14, 1987. Two children were born of the marriage: Sara, born in August 1989, and Kelsie, born in June 1992. On December 8, 1993, Teresa filed for divorce. Later that month, Teresa was named temporary custodian of the children. Galluzzo was ordered to pay temporary child support of $15 per week plus poundage. The child support was paid from the unemployment benefits that Galluzzo was receiving at the time.
 {¶ 71} In June 1994, the divorce was finalized. As part of the final order of divorce, Teresa was named the custodial parent; the court rejected Michael's proposal for shared parenting. The decree required Galluzzo to pay monthly child support in the amount of $52.44 per week and granted him visitation in accordance with the court's standard order. In September 1994, Galluzzo's child support obligation was amended to $58.16 per week due to an error in the magistrate's findings regarding Teresa's monthly income.
 {¶ 72} According to the testimony of Angella Burbrink, a case manager coordinator with the Champaign County Child Support Enforcement Agency ("CSEA"), Galluzzo made one child support payment between July and December 1998; five payments in 1999; two payments in 2000; no payments in 2001; two payments in 2002; one payment in 2003; and no payments in the first five months of 2004. All of the payments received by CSEA between 1998 and 2002 were through wage withholdings. CSEA learned of Galluzzo's employment from Teresa. In June 2001, Galluzzo's arrearage was $18,476.76. By May 2004, the arrearage was $26,863.26.
 {¶ 73} Teresa testified that Galluzzo failed to reimburse medical co-pays as required by the divorce decree and that money that would have been used to pay the loan for her van was applied to raising the children. Teresa indicated that she filed for bankruptcy in December 1994.
 {¶ 74} In August 1998, Teresa married James Cook ("Jim"). Teresa and Jim testified that they and the children initially lived in a small one bedroom/one bathroom apartment (one half of a duplex) while they built a new manufactured home. At that time, Teresa and Galluzzo's daughters and a son from Teresa's first marriage slept in the living room, which had a port-a-bed and a futon on the floor. Teresa testified that they could have been able to afford a larger apartment if Galluzzo had provided support. Although Teresa, Jim, and the children have moved into their new home, portions have not been completed due to financial difficulties. Teresa and Jim both indicated that they have been able to provide basic necessities for Teresa and Galluzzo's two minor daughters, but they have not been able to afford activities or items that would enrich their development, such as music lessons, sports camps, and family vacations. In addition, Teresa indicated that they have a basic telephone line in their home, and that they do bargain shopping. Teresa testified: "[W]e worked very hard to make sure that the children had what they needed to have[,] both my husband and I. And don't feel that they go without the necessities, but they surely could have had a nicer lifestyle had they had the extra income of their father's support too."
 {¶ 75} Testifying on his own behalf, Galluzzo stated that he was in the military for several years after high school, that he went into private industry as an electronic specialist, did electrical installation with different companies, and has done sales, photography and truck driving. At the time of the final divorce decree, Galluzzo was working for Aardvark Studios. Although he earned approximately $200 per week while working, the work was seasonal — May and June, August, and December.
 {¶ 76} Galluzzo testified that his child support obligation was based on incorrect data. He indicated that he had objected to the magistrate's finding in the divorce proceeding that he earned $200 per week; that objection had been overruled. Galluzzo further testified that his annual income at the time was $3,110, not $10,400 as reflected on the child support calculation worksheet. Galluzzo also indicated that the worksheet did not reflect the death benefits that Teresa received from the death of her first husband. Taking into account these and other errors, Galluzzo testified that his monthly child support obligation should have been $15.50 per month, or $31 for both children. Galluzzo further testified, referring to his Social Security tax earnings statement, that he earned $2,306 in 1995; $1,855 in 1996; $8,693 in 1997; $8,875 in 1998; $5,613 in 1999; and $2,146 in 2000.
 {¶ 77} Galluzzo also testified concerning payments that he had made. He stated that he paid money that Teresa had owed on the van loan and that he "was paying a lot more in on her bills than I should have been paying in support." He stated that he paid the Dayair loan until May 1999. Galluzzo also paid the mortgages on his residence.
 {¶ 78} Finally, Galluzzo testified that he had had difficulty securing full-time work since the divorce and that he had several health issues that interfered with his employment. According to Galluzzo's testimony, in 1995, he injured his thumb during an altercation, which resulted in severe arthritis in his thumb joints. In 1996, Galluzzo was admitted to the Veterans Administration hospital due to blood in his stool, and he underwent surgery to remove a third of his colon and his appendix. Galluzzo indicated that he was incapacitated between October 3, 1996, when the surgery occurred, until July or August of 1997. Galluzzo then worked for a photography business between August 1997 and June 1998, when the photography business closed. In December 1998, Galluzzo injured his knee while "messing around" with his son from a prior marriage. He indicated that, as a result, he could not spend much time on his feet, because it would aggravate his knee. In September 1999, Galluzzo had ACL reconstructive surgery; the recovery period was six months. In 2001, Galluzzo obtained a commercial driver's license. Between April 27 and May 26, 2001, Galluzzo was in jail for contempt based on his failure to pay child support. Galluzzo indicated that he had been working four part-time jobs at the time, and that he lost all four sources of income as a result of the incarceration. In early 2002, Galluzzo began experiencing shortness of breath and found he could not do strenuous activities. He had several heart-related evaluations throughout the year. On December 2, 2002, Galluzzo underwent a heart catherization and received three stents. Galluzzo had knee surgery again in 2004. Galluzzo summarized the effect of his medical problems, stating "the medical problems probably cost me a year or two, year and a half of being able to provide steady income."
 {¶ 79} During cross-examination, however, Galluzzo admitted that he had not paid support as ordered by the court for 26 weeks out of 104 consecutive weeks, whether or not the weeks were consecutive, for the periods of time noted in counts three, four, five and six. He further agreed that he knew that he had the obligation to pay the support, and that the orders to pay support were in place between 1998 and 2004 as stated in the bill of information. Galluzzo admitted that his obligation to pay applied to two children under the age of eighteen and that he knew the risks of not paying. Further, Galluzzo stated that he knew that any frustrations that he had with the lack of shared parenting and visitation did not remove his obligation to pay child support.
 {¶ 80} Moreover, Galluzzo admitted that the children's living arrangement with Teresa and Jim at the duplex was not the best environment for his daughters. Galluzzo also testified that he spent $50 per month on high speed internet access that could have been used for child support. In terms of his work experience, Galluzzo acknowledged that he had sales experience, electrical skills experience, could perform general high school math, and had legal intern skills as demonstrated by his pro se briefs. Galluzzo agreed that there were several careers that he could have pursued yet did not. Galluzzo admitted that he had never informed CSEA of his employment or his medical conditions.
 {¶ 81} Upon review of the record, we find ample support for the jury's verdicts. Although Galluzzo asserts that the court's delay in ruling on his motion to modify child support violated his right to due process, the state presented substantial evidence that Galluzzo had been ordered to pay child support under the terms of the divorce decree, and that the support order continued to have effect through 2004. The fact that the trial court had not ruled on Galluzzo's motion does not negate the fact that a valid order remained in effect. Galluzzo, in fact, acknowledged that he knew that he had the obligation to pay the support and that the orders to pay support were in place between 1998 and 2004 as stated in the bill of information.
 {¶ 82} In addition, we do not find that the jury lost its way when it apparently rejected Galluzzo's affirmative defense that he was unable to provide adequate support or the support ordered by the domestic relations court. See 2919.21(D). As noted above, Galluzzo presented evidence regarding a series of medical conditions between 1995 and 2004 and testified that he sought work but was unsuccessful. The prosecutor, on the other hand, elicited testimony from Galluzzo that he had a wide range of skills and that he could have sought work in a number of fields which would not have been physically active, including jobs as a receptionist, customer service representative, data entry person, legal assistant, photo developer, dispatcher, parking garage attendant, quality assurance employee, billing clerk, insurance agent, library staffer, and officer manager. Although Galluzzo asserts that the prosecutor failed to rebut his testimony that he had tried to pursue various jobs but had not "found anybody that would employ me with those skills," Galluzzo further testified that he chose to work part-time jobs instead of full-time positions, in part so that his employment would not interfere with his visitation schedule. In light of Galluzzo's extensive skills and the variety of his experience, the jury could have reasonably concluded that Galluzzo chose to be underemployed and that he could have found a job which would have accommodated his medical conditions if he had elected to pursue one. The verdicts were not against the manifest weight of the evidence.
 {¶ 83} The seventh assignment of error is overruled.
 {¶ 84} VIII. "THE PREJUDICE RESULTING FROM ALL OF THE ERRORS IN THE TRIAL COURT DEPRIVED THE APPELLANT OF A FAIR TRIAL."
 {¶ 85} Under Galluzzo's eighth assignment of error, he argues that the cumulative weight of the errors denied him a fair trial. In light of the fact that we have not identified any arguable errors, there is no basis for a reversal based upon cumulative error.
 {¶ 86} The eighth assignment of error is overruled.
 {¶ 87} The judgment of the trial court will be affirmed.
Brogan, P.J. and Grady, J., concur.
(Hon. Frederick N. Young sitting by assignment of the Chief Justice of the Supreme Court of Ohio).
[1] Crim.R. 30(A) has recently been amended, effective July 1, 2005. This most recent version is not at issue.