[Cite as *State v. Smith*, 2019-Ohio-5015.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28265 |
| | : | |
| v. | : | Trial Court Case No. 2018-CR-1861 |
| | : | |
| JUSTIN K. SMITH | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 6th day of December, 2019.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by HEATHER N. JANS, Atty. Reg. No. 0084470, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

APRIL F. CAMPBELL, Atty. Reg. No. 0089541, 545 Metro Place South, Suite 100, Dublin, Ohio 43017
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} Following a bench trial, Justin K. Smith was found guilty of three third-degree felony counts of sexual battery (coach/scout leader) in violation of R.C. 2907.03(A)(9), three third-degree felony counts of unlawful sexual conduct with a minor in violation of R.C. 2907.04(A), and two third-degree misdemeanor counts of sexual imposition in violation of R.C. 2907.06(A)(4). The trial court merged the unlawful sexual conduct offenses into the corresponding sexual battery offenses and sentenced Smith to 48 months on each of the three sexual battery offenses, to run consecutively for a total of 12 years in prison.[1] Smith appeals from that judgment. The judgment of the trial court will be affirmed.

## Factual and Procedural Background

{¶ 2} In early 2018, 41-year-old Smith was the president of the Southwest Soccer Club and coached two of that club's girls' soccer teams. Among the members of one team Smith coached were 14-year-old C.B. and Smith's daughter of the same age, who were close friends. C.B.'s mother ("Mother") also had become friends with Smith through years of coaching their daughters' soccer teams together. Due to the two girls' friendship, C.B. slept over at the Montgomery County home of Smith, his wife, and their three children on a monthly or more frequent basis.

{¶ 3} On March 27, 2018, Mother dropped C.B. at a soccer training session run by a paid trainer. While waiting for the training to end, Mother looked through C.B.'s iPhone, which she (C.B.) had left in the car. Mother found a series of "emotionally explicit" and

_____

[1] The court also sentenced Smith to 60 days of local incarceration on each of the misdemeanor sexual imposition offenses, to run concurrent with his other sentences. Smith has not appealed that aspect of the court's judgment.

"sexually explicit" text messages between C.B. and Smith. Mother texted Smith, telling him that she had C.B.'s phone and asking, "Oh, my God, what have you done[?]" Smith replied "with the word 'what' and a question mark," to which Mother did not respond.

{¶ 4} When C.B. returned to the car and Mother told C.B. that she (Mother) had looked through the phone, C.B. "broke down in immediate hysterics." After questioning C.B., Mother drove home and told her husband ("Father") what she had discovered. Mother and Father spoke privately with C.B., then discussed how to proceed. They confiscated C.B.'s iPhone and canceled her activities for the coming week of spring break. Mother and Father then had a telephone conversation with Smith in which they "threatened * * * to go to the authorities and the soccer board should he attempt to contact [C.B.] again." They also demanded that Smith step down from coaching. As to why they did not go to the police at that time, Mother explained:

We live in an extremely small town * * *

* * * [W]e thought the blowback on [C.B.], stigma, * * * would be something that she could not escape and we thought it best that we attempt to control the situation within the confines of our own home with our own rules put in place * * *

(Tr., p. 119.)

{¶ 5} The following day, Smith sent "an apology text" to Mother, "begging for mercy and asking that [Mother and Father] still allow him to coach."[2] When Mother rejected his

---

[2] Copies of Smith's apology were admitted into evidence at trial as State's Exhs. 4 and 4A.

plea, however, Smith resigned his coaching position before the end of that week.[3] Thereafter, in moments she described as "self-torture," Mother occasionally scrolled through C.B.'s text messages, preserving screenshots of "a handful – ten maybe" of the more recent exchanges between Smith and C.B. and sending them to Mother's own cell phone,[4] as a form of "insurance" that Smith would comply with Mother and Father's demands. Mother returned C.B.'s iPhone to C.B. on May 6, 2018, so that C.B. would have it for a school trip to Washington, D.C. later that week. Before doing so, Mother deleted all of the text messages between Smith and C.B.[5]

{¶ 6} When Mother went to awaken C.B. on the morning of May 7, 2018, Mother saw a Samsung cell phone[6] that she did not recognize sticking out from beneath C.B.'s pillow. C.B. at first claimed that the phone must have been left by someone attending her sister's birthday party the weekend prior. After demanding and entering the passcode (which was Smith's birthday), Mother found text messages from a telephone number that she immediately recognized as Smith's. In less than 24 hours between May 5 and May 6, Smith and C.B. had exchanged 327[7] text messages. Mother and Father sent C.B. to

---

[3] At trial, the State presented a copy of Smith's resignation letter as State's Exh. 7.

[4] Printouts of the preserved exchanges were presented into evidence at trial as State's Exh. 1.

[5] According to Mother, she mistakenly believed that copies of the deleted text messages would be "backed up to the cloud." (Tr., p. 133.) She said "hundreds or thousands" of messages between Smith and C.B were deleted. (*Id.*, p. 140.)

[6] The Samsung phone was admitted as State's Exh. 2.

[7] The record as to the number of text messages varies between 327 and 326. (*See* Tr., pp. 145, 251, 252, 385.)

school; Father then called Sergeant Mark Bruner of his township's police department, who was the school resource officer for C.B.'s school. Together, Mother and Sgt. Bruner determined that the text messages deleted from C.B.'s iPhone were not recoverable. However, Mother gave Sgt. Bruner the Samsung phone and sent him copies of the screenshots of text messages from C.B.'s iPhone.

{¶ 7} Sgt. Bruner's police department contacted the Montgomery County Sheriff's Office due to jurisdictional issues in the case, and Detective Isaiah Kellar of the Sheriff's Office was assigned to investigate the allegations against Smith. Det. Kellar observed remotely while C.B. went through her initial forensic interview at CARE House[8] in Dayton on May 8, 2018. Det. Kellar described C.B. as "very emotional" during that interview. He continued:

> She was upset, nervous, reluctant. You could tell she did not want to be there. She cried. She just – her demeanor was not of a child that wanted to be in that room.
>
> * * *
>
> * * * [S]he minimized the defendant and said several times I wanted to do it, I never said no.

(Tr., p. 297.) Det. Kellar said that during that interview, C.B. "said multiple times how much she loved" Smith. (*Id.,* p. 330.) Nevertheless, according to Det. Kellar, C.B. did disclose at that time that a sexual relationship existed between her and Smith.

---

[8] As later explained by trial witness Dr. Brenda Miceli, CARE House represents Montgomery County's "approach to child abuse," bringing together five agencies to provide coordinated mental health and medical services to child victims of sexual abuse. (Tr., p. 191.)

{¶ 8} Det. Kellar next interviewed Smith, verified his cell phone number, and collected Smith's cell phone, which was sent to the Secret Service laboratory for help in overriding the password protection feature.[9] Det. Kellar identified the screenshots of text messages provided by Mother and the Samsung phone recovered from C.B. He confirmed that all text messages on the Samsung phone were to and from Smith's cell phone number. He also identified copies of text messages that he was able to extract from that phone. Det. Kellar determined that the Samsung also contained numerous images of "sexual positioning" in which C.B.'s nude breasts, vagina, legs, and buttocks were displayed. Because C.B. had not revealed the existence of those photographs in her initial forensic interview, Det. Kellar contacted Mother and asked her to bring C.B. to the Sheriff's Office for an additional interview, which occurred about a week later in May.

{¶ 9} Det. Kellar testified that, based on his training and experience, the existence of the nude photographs led him to suspect that "there's more to [C.B.'s] relationship" with Smith than C.B. "originally disclosed in the forensic interview." (*Id.*, p. 303.) He further indicated that it is common for crime victims to make additional disclosures over the course of an investigation. According to Det. Kellar, his investigation revealed that the "showcase" tournament for C.B.'s soccer team took place in Indianapolis from February 23-25, 2018. On cross-examination, Det. Kellar acknowledged that he also conducted a third, pre-trial interview in which C.B. disclosed yet more information.

{¶ 10} Det. Kellar presented the results of his investigation to the prosecutor's

---

[9] Because of the password protection, no evidence from Smith's cell phone was available at the time of Smith's trial in this case. On December 31, 2018, however, a new indictment was issued based on "evidence that was [found] on [Smith's] phone." (Tr., pp. 467-468); *see State v. Smith*, Montgomery Cty. C.P. No. 2018 CR 4830.

office. On May 18, 2018, a Montgomery County grand jury indicted Smith on six counts: two counts of unlawful sexual conduct with a minor in violation of R.C. 2907.04(A), third-degree felonies (Counts I and II); two counts of sexual battery (coach/scout leader) in violation of R.C. 2907.03(A)(9), third-degree felonies (Counts III and IV); and two counts of sexual imposition in violation of R.C. 2907.06(A)(4), third-degree misdemeanors (Counts V and VI). (Doc. #1 ("Indictment A").) Subsequently, the indictment was amended to add one additional count of sexual conduct with a minor and one additional count of sexual battery (coach/scout leader). (Doc. #62 ("Indictment B").)

{¶ 11} Smith pled not guilty and was placed on a conditional own recognizance ("COR") bond with electronic home detention ("EHDP"). Smith repeatedly moved for a reduction of the bond order, including removal of the EHDP condition or expansion of his permitted area of movement. Following a June 28, 2018 hearing, the Court set bond at $50,000, together with the condition that Smith again be placed on COR with EHDP if he posted the required surety bond. Smith posted bond the next day.

{¶ 12} A jury trial originally scheduled for October 2, 2018 was continued after Indictment B was issued on September 28, 2018. On the rescheduled trial date of October 29, 2018, Smith signed a written waiver of jury, and the matter proceeded to a bench trial.

{¶ 13} At trial, Mother and Det. Kellar testified as outlined above. The State also presented Brenda Miceli, Ph.D., a pediatric psychologist with CARE House at Dayton Children's Hospital, as an expert witness in the field of child sexual abuse. Dr. Miceli said she recently had met with C.B. twice, to perform a psychological evaluation and to begin therapy that would be ongoing, but not for the purpose of determining whether abuse had occurred. She also had not been authorized to disclose details of C.B.'s particular case.

{¶ 14} Generally, Dr. Miceli said that because children are "not able to fully appreciate the circumstances" of sexual behavior between an adult and a child, consent is immaterial to child sexual abuse. She said that secrecy and helplessness are typical components of child sexual abuse. She also explained that adult abusers often are "somebody who has some amount of authority or power over" the child. Dr. Miceli described "grooming" as "the process by which the boundaries that are appropriate become blurred over time." She said that when sexual abuse is disclosed accidentally before a child is ready to talk about it, he or she "will oftentimes just deny that anything occurred."

{¶ 15} Dr. Miceli testified that children who "are unsure how people will respond * * * may give bits of information. The types of information they're more likely to withhold are things that usually involve more embarrassing acts such as anal sex or oral sex." According to Dr. Miceli, "the closer the relationship and the more authority that a person has over a child the less likely they are to disclose." She opined that child victims are more likely to under-disclose than to embellish the details of abuse that occurred.

{¶ 16} C.B. also testified at the trial. She identified Smith as the former coach of her club soccer team. She said she met Smith through playing soccer when she was about eight years old, and she became friends with one of Smith's daughters, who was C.B.'s age, played on her soccer team, and attended her school. She said she saw the Smiths frequently and sometimes had sleepovers at their house. C.B. said that she and Smith began to communicate via text message. At first, "he would just like compliment me or the way I looked or how I played and eventually there was [sic] a lot of compliments and over time it led to a different kind of relationship." (Tr., p. 223.)

{¶ 17} As C.B.'s team entered the winter "showcase season," performing before college coaches, C.B. saw Smith more often and began to go to his house more often. The text messages between them increased in frequency and "started to just get more personal" (*id.*, p. 225); "[w]e talked about kissing each other, hugging each other." (*Id.*, p. 227.) One evening, Smith, his daughter, and C.B. were watching a movie together in Smith's basement during a sleepover at Smith's house. Smith's daughter fell asleep and C.B. moved to the other couch to sit next to Smith. She initiated a hug, then "[w]e were hugging each other. He was touching my legs and my arms." (*Id.*) In their texts afterward, Smith told C.B. "[w]e should've kissed." (*Id.*, p. 228.) C.B. testified that she never had kissed anyone before, and she felt as though kissing Smith would mean she and he were "like dating," an idea she didn't like.

{¶ 18} C.B. said that when she next spent the night at Smith's house and Smith's daughter again fell asleep on the couch in the basement, Smith "started kissing my cheek and then kissed my mouth." (*Id.*, p. 229.) C.B. said there was "more touching the legs and arms, hugging." (*Id.*, p. 230.) She said Smith then suggested "that we would be more comfortable upstairs so we moved up there," to the bedroom. (*Id.*) Smith's wife was not at home. Although C.B. said she didn't remember "exactly what happened the next time," she said that when she and Smith were not together, they would exchange texts "about the things that we should do the next time." (*Id.*, p. 231.) Ultimately, "[h]e and I both performed oral sex on each other. He fingered me. I gave him a hand job. He's – touching, kissing." (*Id.*) C.B. stated that Smith touched her "[e]verywhere – boobs, butt, vagina," both while clothed and unclothed. (*Id.*, p. 232.) C.B. said that Smith touched both the outside and the inside of her vagina with his hand. Although she had never performed a

"hand job" or oral sex before, Smith instructed her by text message on what to do. Pressed for specifics, she stated that each of them had mouth-to-genitals contact with the other, and that Smith once ejaculated while she manipulated his penis with her hand.

{¶ 19} C.B. said that to avoid being caught, "usually I would delete my text messages" each night, "and we would never tell anybody about our relationship or what was going on between us." (*Id.*, p. 233.) C.B. testified that Mother found out about the relationship with Smith in April 2018, when C.B. left her iPhone in Mother's car during soccer training and Mother read C.B.'s text messages. C.B. said that Mother took her (C.B.'s) phone away and that the text messages had been deleted when Mother eventually returned that phone. C.B. identified the screenshots presented into evidence as a sample of the text messages between herself and Smith on that phone. C.B. said that Smith's text about "naked kissing" referred to something she and Smith actually had done, and his text about her "kissing [Smith's] spot" referred to a place on his neck that she had kissed. She said Smith's comment about her nipples also referred to something they had done.

{¶ 20} C.B. explained that one early string of text messages was about Smith "wanting us to be in a relationship and I didn't want to be." (*Id.*, p. 245.) However, C.B. stated that she later believed she was in love with Smith. According to C.B., she and Smith "planned on getting married and having kids"; they even had chosen a name for one future child. (*Id.*, p. 241.) C.B. said that when Mother took away her iPhone, Smith found a way to give her another cell phone so that she could continue to communicate with him. According to C.B., at the end of a school day, Smith's daughter told her that Smith had something for her, so C.B. followed Smith's daughter outside the school, where

Smith handed his daughter an envelope that the daughter then handed to C.B. Inside were a cell phone and charger. C.B. identified an exhibit as the cell phone Smith provided. She said she kept it hidden inside a box in a chest in her bedroom and would use it to text Smith every night, then she would delete the texts. C.B. said she also used the phone to send Smith photos of her "[b]oobs, butt, vagina, legs," and videos of her "touching myself," because she "thought he would like them." (*Id.*, pp. 248-249.) She identified exhibits as copies of those photographs.

{¶ 21} C.B. testified that Mother found the phone provided by Smith when C.B. overslept one morning after failing asleep with the phone in her hand. She said that the 326 text messages from May 5 to May 6 were fewer than she and Smith typically exchanged each night because "I fell asleep that night [and] usually I would stay up a little later and text him more than I did that night." (*Id.*, p. 252.) From the witness stand, C.B. read through the text messages from that night, including texts in which Smith referred to the phone as "a smoking gun" and suggested that he wished she had "a different carrier" that would make their communications easier to conceal. (*Id.*, pp. 267-268.)

{¶ 22} C.B. said that she was "[u]pset and embarrassed" during her first interview at CARE House and did not tell the interviewer everything that had happened between her and Smith because she didn't want Smith "to get in trouble." She said she later disclosed additional information during an interview with Det. Kellar.

{¶ 23} C.B. described the negative impact on her life stemming from her relationship with Smith:

A lot of people know and * * * treat me different because of it. * * * I didn't

get a date to Homecoming. No boys really want to talk to me. My friend

group that I had, it's not really my friend group anymore. Yeah.

(*Id.*, p. 274.)

{¶ 24} At the close of the prosecution's case, the trial court denied Smith's Crim.R. 29(A) motion for acquittal based on the State's purported failure to prove proper venue. Smith then testified as the only defense witness. Smith confirmed that he had known C.B. and coached her in soccer since C.B. was eight. He said that C.B. was friends with both of his daughters and frequently had stayed at his house. He said that he exchanged text messages with all of his soccer players, but that in November and December of 2017, his exchanges with C.B. increased. Smith said the text messages became more personal and gradually moved into a "friendship," then beyond.

{¶ 25} Smith recalled an occasion when he hugged C.B. while they were in his basement watching movies. He said that on a subsequent occasion, C.B. found Smith alone in the basement after he learned that his grandfather had died, and to console him, C.B. "gave me a hug and kissed my forehead and rubbed the back of my head." (Tr., p. 371.) Smith said C.B. then was simply "being kind." On a later date, however, Smith's daughter fell asleep on the couch and Smith kissed C.B. on the cheek; "I don't know who kissed each other after that but that was the first time we actually kissed," despite discussing kissing in prior text messages.

{¶ 26} Smith also acknowledged that there had been times when he and C.B. had their clothes off or "pushed to the side" in his basement and bedroom and he touched her breasts, legs, and buttocks. (*Id.*, p. 374.) He confirmed that C.B. also gave him a "hand job" in his basement. However, he denied that he ever performed oral sex on C.B. or C.B. ever performed oral sex on him in his home. He also denied ever penetrating C.B. digitally

in his home, or ever having sexual intercourse with her.

{¶ 27} On cross examination, Smith acknowledged that he had engaged in sexual behavior with C.B. somewhere other than in his home; he said he didn't recall where, "but it wasn't in Montgomery County." (*Id.*, p. 377.) He also acknowledged that he purchased a Samsung phone for C.B.to use after her parents took away her iPhone. However, Smith said he did not use his daughter to deliver that phone, but rather texted his daughter and asked her to have C.B. come out to his car. Smith said he labeled the envelope containing the phone "referee money" so his daughter would not be suspicious, and he handed the envelope directly to C.B.

{¶ 28} Confronted with copies of text messages that he and C.B. exchanged on the Samsung phone, Smith explained that references he made to being "mad we're not having sex tonight" and to nights when "the sexual stuff just doesn't work for us" probably meant sexual texts or "touching and holding." He acknowledged that one of C.B.'s messages to him stated that they had "committed a crime," but offered no explanation. Smith also agreed that he had expressed concern to C.B. about assuring that her returned iPhone contained no evidence of his text messages, and that he had encouraged her to delete his texts; "I didn't want her to get in trouble any further." As to whether he and C.B. thereafter had exchanged photographs and videos, Smith said, "Perhaps. Yes, I guess we did. * * * I'm not sure. * * * I don't recall sending her videos." While agreeing that C.B. had been honest about certain aspects of their relationship, Smith maintained that C.B. lied about the two having oral sex and about Smith digitally penetrating C.B.

{¶ 29} When Smith failed to return to the courtroom following that day's lunch recess, an employee of the trial court's pretrial services department was called and

testified that Smith had tampered with his ankle monitor and his whereabouts were unknown. Without objection, the trial continued in Smith's absence.

{¶ 30} On November 6, 2018, the trial court found Smith guilty of all eight offenses charged. Smith subsequently was arrested in Florida and returned to Ohio on December 20, 2018. Smith immediately requested a continuance of the January 3, 2019 sentencing hearing, citing defense counsel's travel plans and a psychological examination of Smith scheduled for January 8, 2019. Smith also filed an affidavit in the Supreme Court of Ohio to disqualify the trial judge. The trial court denied the motion for continuance and the Supreme Court denied the affidavit of disqualification.

{¶ 31} Sentencing proceeded on January 3, 2019. Per the State's election, the trial court merged the three unlawful sexual conduct with a minor offenses into the three corresponding sexual battery offenses, and sentenced Smith to 48 months on each of the sexual battery offenses, to run consecutively for a total of 12 years in prison. Smith also was designated a Tier I and Tier III Sex Offender and placed on five years of post-release control.

{¶ 32} Smith appeals from that judgment, asserting these six assignments of error:

1) Smith's felony convictions should be reversed because the State did not establish jurisdiction or venue for any of them.

2) Because Smith was not tried in a fair tribunal, his Due Process right to be given a "fair trial in a fair tribunal" was denied, requiring reversal of his convictions.

3) Because the trial court revoked Smith's bond without cause in violation of Crim.R. 46(H), his right to Due Process, and his right against cruel and

unusual punishment was [sic] denied.

4) The State engaged in prosecutorial misconduct in opening and close [sic], which prejudicially affected Smith's Due Process right to a fair trial.

5) The trial court abused its discretion by unreasonably denying Smith's motion to continue his sentencing hearing, requiring reversal of his sentence.

6) The trial court's decision to impose consecutive sentences should be vacated.

{¶ 33} We will address those assignments of error in an order conducive to our review.

### Assignment of Error #1 – Insufficient Evidence of Venue

{¶ 34} Smith first asserts that his sexual battery convictions should be reversed because the State failed to establish where those offenses occurred. According to Smith, although C.B.'s testimony placed certain misdemeanor acts of sexual contact inside Smith's Montgomery County home, she did not identify the location at which any acts of oral sex or digital penetration supporting the felony offenses were alleged to have taken place. He also cites his own trial testimony for the proposition that certain sexual behavior that took place between him and C.B. took place outside of Montgomery County.

{¶ 35} Pursuant to Article I, Section 10 of the Ohio Constitution and R.C. 2901.12, "evidence of proper venue must be presented in order to sustain a conviction for an offense." *State v. Hampton*, 134 Ohio St.3d 447, 2012-Ohio-5688, 983 N.E.2d 324, ¶ 20. "It is not essential that the venue of the crime be proven in express terms, provided it be established by all the facts and circumstances in the case, beyond a reasonable doubt,

that the crime was committed in the county and state as alleged in the indictment." *Id.* at ¶ 19, quoting *State v. Dickerson*, 77 Ohio St. 34, 82 N.E. 969 (1907), paragraph one of the syllabus. Circumstantial evidence may be used to establish venue. *State v. Brown*, 2017-Ohio-8416, 99 N.E.3d 1135, ¶ 33 (2d Dist.), citing *State v. May*, 2015-Ohio-4275, 49 N.E.3d 736, ¶ 24 (8th Dist.).

{¶ 36} A challenge to venue raised through a Crim.R. 29 motion for a judgment of acquittal preserves for appeal the issue of the sufficiency of the evidence regarding venue. *See State v. Hibbler*, 2d Dist. Clark No. 2001-CA-43, 2002-Ohio-4464, ¶ 23.

{¶ 37} Ohio's venue statute provides that the trial of a criminal case "shall be held in a court having jurisdiction of the subject matter, and * * * in the territory of which the offense or any element of the offense was committed." R.C. 2901.12(A). That statute further provides as follows:

(H) When an offender, as part of a course of criminal conduct, commits offenses in different jurisdictions, the offender may be tried for all of those offenses in any jurisdiction in which one of those offenses or any element of one of those offenses occurred. Without limitation on the evidence that may be used to establish the course of criminal conduct, any of the following is prima-facie evidence of a course of criminal conduct:

(1) The offenses involved the same victim, or victims of the same type or from the same group.

(2) The offenses were committed by the offender in the offender's same employment, or capacity, or relationship to another.

(3) The offenses were committed as part of the same transaction or chain

of events, or in furtherance of the same purpose or objective.

(4) The offenses were committed in furtherance of the same conspiracy.

(5) The offenses involved the same or a similar modus operandi.

(6) The offenses were committed along the offender's line of travel in this state, regardless of the offender's point of origin or destination.

R.C. 2901.12(H).

{¶ 38} The record contains sufficient evidence to establish that venue was proper in the trial court. In testifying about the physical and sexual aspects of her relationship with Smith, C.B. described encounters that began in the basement of Smith's home, and that on at least one occasion continued after the two moved upstairs to Smith's bedroom. C.B. said that her encounters with Smith included her hand on Smith's penis through ejaculation, her mouth on Smith's penis, Smith's mouth on her genitals, and Smith's penetrating her digitally. At no time did C.B. allude to any of those acts taking place anywhere other than inside Smith's Montgomery County home. Although C.B. did not state specifically that the digital penetration and oral sex occurred at Smith's house, her testimony was sufficient to support an inference that they did.

{¶ 39} Alternatively, C.B.'s testimony was sufficient to establish that all sexual interaction between Smith and C.B. was part of a single "course of criminal conduct" within the meaning of R.C. 2901.12(H). All the charged offenses involved the same victim (C.B.), were committed by the same offender (Smith) in his capacity as or relationship to C.B. as C.B.'s soccer coach, and were committed as part of the same chain of events in furtherance of the same objective (a sexual relationship with C.B.). In a case where an adult committed a series of sex offenses against the same minor victim in different

jurisdictions, this Court concluded that venue was proper where any one of the offenses occurred since the offenses constituted part of the same course of criminal conduct. *See State v. Weber*, 2d Dist. Montgomery No. 25508, 2013-Ohio-3172, ¶ 35.

{¶ 40} Smith's first assignment of error is overruled.

**Assignment of Error #3 – Revocation of Bond**

{¶ 41} In his third assignment of error, Smith argues that he was denied his right to due process of law by the trial court's revocation of his bond without cause. In support of that argument, he cites Crim.R. 46(H), which provides as follows:

Unless otherwise ordered by the court pursuant to division (E) of this rule, or if application is made by the surety for discharge, the same bond shall continue until the return of a verdict or the acceptance of a guilty plea. In the discretion of the court, the same bond may also continue pending sentence or disposition of the case on review. Any provision of a bond or similar instrument that is contrary to this rule is void.

{¶ 42} The other subsection referenced within Crim.R. 46(H) states: "A court, at any time, may order additional or different types, amounts, or conditions of bail." Crim.R. 46(E). Thus, under the current version of Crim.R. 46, "there is no longer a 'right' to the continuation of bond as stated in former Crim.R. 46." *King v. Telb*, 6th Dist. Lucas No. L-05-0122, 2005-Ohio-800, ¶ 17.[10] Smith's argument apparently is premised on a version of Crim.R. 46 that no longer applies. Additionally, even under the prior version of Crim.R.

---

[10] The court in *Telb* noted that "[t]he prior version of Crim.R. 46(J) stated that "[u]nless application is made by the surety for discharge, the same bond shall continue *as a matter of right* until the return of a verdict or judgment by a jury * * *." (Emphasis sic.) *Id.* at ¶ 16. A July 1998 amendment to Crim.R. 46 removed the "as a matter of right" language. *Id.*

46, the trial court had discretion to alter a defendant's conditions of bail "as the circumstances may warrant, such as, where new information is presented to the trial court regarding the likelihood that the accused may abscond." *Utley v. Kohl*, 120 Ohio App.3d 52, 55, 696 N.E2d 652 (6th Dist.1997), superseded by amendment to Crim.R. 46, as stated in *Telb* at ¶ 17.

{¶ 43} The trial court acted within its discretion in revoking Smith's bond. Crim.R. 46(E) expressly authorizes a court to order different conditions of bail. Furthermore, in Smith's case, the trial court did so after a hearing that included testimony from Det. Kellar about how Smith had used his position as C.B.'s soccer coach to develop a relationship with her, and how Smith had used his daughter to assist in providing a new cell phone to C.B. after promising C.B.'s parents that he would have no further contact with her.[11] Smith's right to due process was not infringed by the court's bond revocation decision.

{¶ 44} In addition, irrespective of the merits of Smith's argument, "any error concerning the issue of pretrial bail is moot" once a conviction has occurred. *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 206, quoting *State v. Patterson*, 110 Ohio App.3d 264, 271, 673 N.E.2d 1001 (10th Dist.1996). We have applied that principle in finding that a trial court did not commit reversible error by revoking a defendant's own-recognizance bond and instead setting a surety bond without holding a hearing. *See State v. Crawford*, 2d Dist. Montgomery No. 26073, 2014-Ohio-4599, ¶ 12, citing *Drummond* and *Patterson, supra*. Smith "should have raised his pretrial bail

---

[11] To the extent that the revocation decision may have been based on the trial court's assessment of "the likelihood that the accused m[ight] abscond," *see Utley* at 55, any such assessment was borne out by the fact that Smith *did* abscond immediately after testifying at his trial.

claim, if at all, in a habeas corpus proceeding." *See State v. Tibbetts*, 92 Ohio St. 3d 146, 152, 749 N.E.2d 226 (2001).

{¶ 45} For the foregoing reasons, Smith's third assignment of error is overruled.

**Assignment of Error #4 – Prosecutorial Misconduct**

{¶ 46} Smith contends in his fourth assignment of error that he was denied a fair trial due to "improper remarks" made by the assistant prosecutor during her opening statement and closing argument to the court. Specifically, Smith points to the State's opening that termed the facts of Smith's case "a parent's worst nightmare" and called Smith a "master manipulator" and "perpetrator" who "needs to be held accountable" for "stealing [C.B.'s] innocence;" and to the State's repeating some of the same verbiage during closing. (*See* Tr., pp. 94, 100; pp. 423, 424, 425.) Smith also challenges the prosecutor's closing remarks that dismissed as "ludicrous" defense counsel's suggestion that C.B. exaggerated the extent of Smith's actions in response to pressure from her parents, and opined that Smith needed "a wake-up call." (*Id.*, pp. 425, 434.)[12]

{¶ 47} "In reviewing claims of prosecutorial misconduct, the test is whether the prosecutor's remarks were improper and, if so, whether those comments prejudicially affected the substantial rights of the defendant." *State v. Quarles*, 2015-Ohio-3050, 35 N.E.3d 616, ¶ 64 (2d Dist.), citing *State v. Jones,* 90 Ohio St.3d 403, 420, 739 N.E.2d 300 (2000). The touchstone of due process analysis "is the fairness of the trial, not the culpability of the prosecutor." *Id.,* quoting *Smith v. Phillips,* 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). Where it is clear beyond a reasonable doubt that the

---

[12] Smith's suggestion that the purported misconduct was heightened by the lack of a "curative instruction" (*see* Appellant's Brief, p. 20) is inapposite given that his case was tried to the court rather than to a jury.

defendant would have been found guilty even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed. *Id.*, citing *State v. Underwood,* 2d Dist. Montgomery No. 24186, 2011-Ohio-5418, ¶ 21.

**{¶ 48}** We review allegations of prosecutorial misconduct in the context of the entire trial. *State v. Stevenson,* 2d Dist. Greene No. 2007-CA-51, 2008-Ohio-2900, ¶ 42, citing *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). "The prosecution is * * * entitled to significant latitude in its closing remarks," and "may comment freely on 'what the evidence has shown and what reasonable inferences may be drawn therefrom.' " *State v. Carpenter*, 116 Ohio App.3d 615, 622, 688 N.E.2d 1090 (2d Dist.1996), citing *State v. Maurer*, 15 Ohio St.3d 239, 267, 473 N.E.2d 768 (1984), and quoting *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990). Considerable latitude likewise extends to a prosecutor's opening statement. *See State v. Whitfield*, 2d Dist. Montgomery No. 22431, 2009-Ohio-293, ¶ 12. "During opening statement, a prosecutor may, in good faith, make statements as to what he expects to prove by competent evidence." *State v. Neal*, 10th Dist. Franklin No. 95APA05-542, 1996 WL 28765, *8 (Jan. 23, 1996). Such statements, even if ultimately not borne out by the evidence actually presented, do not constitute reversible error "unless it appears that counsel made the statement in bad faith." (Citations omitted.) *State v. Costell*, 3d Dist. Union No. 14-15-11, 2016-Ohio-3386, ¶ 112.

**{¶ 49}** In addition, "[t]he impact of [a prosecutor's] remarks is lessened when they are heard by a court, since the court is presumed to only consider relevant evidence." *Steubenville v. Whittaker*, 7th Dist. Jefferson No. 17 JE 0025, 2018-Ohio-4014, ¶ 42, citing *State v. Wiles*, 59 Ohio St.3d 71, 87, 571 N.E.2d 97 (1991). *Accord State v. Boyce*,

8th Dist. Cuyahoga No. 93543, 2010-Ohio-3870, ¶ 36, citing *State v. Post*, 32 Ohio St.3d 380, 384, 513 N.E.2d 754 (1987) ("There is a presumption in a bench trial in a criminal case that the court considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary.").

{¶ 50} Failure to object to prosecutorial misconduct at trial waives all but plain error. *State v. Cohen*, 2d Dist. Greene No. 2001 CA 8, 2002 WL 313133, *1 (Mar. 1, 2002). This Court has stated:

> We recognize plain error " 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' " In order to prevail on a claim governed by the plain error standard, [the defendant] must demonstrate that the outcome of [his or] her trial would clearly have been different but for the errors that [he or] she alleges. Thus, the alleged prosecutorial misconduct constitutes plain error only if it is clear that [the defendant] would not have been convicted in the absence of the improper comments.

(Citations omitted.) *Id.*, quoting *Carpenter* at 621. In cases where no objection was made to alleged misconduct occurring during the State's closing argument, "[t]he plain error standard generally presents, in accordance with its design, an almost insurmountable obstacle to reversal * * *." *Id.*, quoting *Carpenter* at 621.

{¶ 51} Smith did not object at trial to any of the conduct that forms the basis for this assignment of error. As we find the specific remarks identified by Smith to have been neither unduly inflammatory nor prejudicial, Smith has failed to establish the existence of error, plain or otherwise.

{¶ 52} "For a prosecutor's closing argument to be prejudicial, the remarks must be 'so inflammatory as to render the jury's decision a product solely of passion and prejudice.' " *State v. Taylor*, 2d Dist. Montgomery No. 25146, 2013-Ohio-1587, quoting *State v. Arrone,* 2d Dist. Greene No.2005 CA 89, 2006-Ohio-4144, ¶ 126. Labeling a child's seduction by her adult soccer coach as "a parent's worst nightmare" is a vivid but not inapt description of the allegations in Smith's case. Likewise, characterizing Smith as a "master manipulator" and "perpetrator" before presenting any evidence to substantiate those opening comments did not amount to prosecutorial misconduct. Although "prosecutors must refrain from * * * expressing personal belief or opinions regarding the defendant's guilt," *State v. Renner*, 2d Dist. Montgomery No. 25514, 2013-Ohio-5463, ¶ 60, terming Smith a "manipulator" did not equate to an opinion that he was guilty of all the offenses charged, and Smith's trial testimony admitting to the elements of the misdemeanor sexual contact offenses established that he was a "perpetrator." Especially here, where the prosecution's remarks were heard by the trial court rather than by a jury, we have no basis to conclude that the guilty verdict against Smith was the product of passion or prejudice stoked by the prosecutor's remarks to that effect.

{¶ 53} A similar conclusion follows as to the prosecutor's references to defense counsel's argument as "ludicrous" and to Smith as needing "a wake-up call." Although "personal attacks and accusations against defense counsel" may amount to prosecutorial misconduct, attacking the plausibility of defense counsel's *argument* rather than attacking defense counsel personally falls within "the normal latitude allowed in closing arguments." *See Maurer*, 15 Ohio St.3d at 267, 473 N.E.2d 768. Further, in arguing that Smith needed "a wake-up call," the prosecutor was echoing Smith's own statement, in his text message

apology to C.B.'s parents, that their discovery of his relationship with C.B. had been "the biggest wake-up call in my life." (*See* Tr., p. 124, and State's Exh. 4A.) By merely observing that Smith apparently had not experienced a "wake-up call" despite the second chance extended by C.B.'s parents, the prosecutor did not act improperly, and Smith was not prejudiced by the trial court's having heard the prosecutor's remarks.

**{¶ 54}** Smith's fourth assignment of error is overruled.

### Assignment of Error #5 – Denial of Sentencing Continuance

**{¶ 55}** In his fifth assignment of error, Smith maintains that the trial court abused its discretion in three respects by "unreasonably denying" his request that his sentencing be delayed. First, Smith contends that the court erred by failing to determine that a continuance was necessary in order for defense counsel to explore any double jeopardy issues implicated by a new indictment against Smith stemming from nude images found on his cell phone. Second, he asserts that the trial court improperly "elevated the State's position over Defense Counsel's" by accepting the prosecutor's representation that no double jeopardy problem existed. Finally, Smith argues that the factors to be considered regarding a motion to continue sentencing weighed in favor of granting a continuance in this instance.

**{¶ 56}** A trial court has broad discretion to grant or deny a motion for a continuance. *State v. Danon*, 2018-Ohio-419, 105 N.E.3d 596, ¶ 28 (2d Dist.), citing *State v. Bones*, 2d Dist. Montgomery No. 26017, 2015-Ohio-784, ¶ 61. In exercising its discretion, a trial court should consider "the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether

it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which give [sic] rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case." *Id.,* quoting *State v. Bocock,* 2d Dist. Montgomery No. 22481, 2008-Ohio-5641, ¶ 23.

{¶ 57} The term "abuse of discretion" implies that the trial court's decision was unreasonable, arbitrary or unconscionable. *State v. Griffin,* 2d Dist. Montgomery No. 24001, 2012-Ohio-503, ¶ 9. "It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." (Citation omitted.) *Id.* "A decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue de novo, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result." *Id.*

{¶ 58} The trial court did not abuse its discretion by denying Smith's motion to continue his sentencing. Smith was absent from the trial court's jurisdiction from October 31, 2018, when he absconded during the second day of his trial, through approximately December 20, 2018.[13] Considering the relevant factors in light of that fact leads to the conclusion that Smith "contributed to the circumstance which g[a]ve rise to the request for a continuance." *See Danon* at ¶ 28. The court cannot be said to have acted unreasonably by determining that Smith's choice to absent himself from Montgomery

---

[13] Although the record does not reveal precisely when Smith was returned to Montgomery County following his arrest, in a motion filed on December 21, 2018, Smith's attorney stated that Smith was "booked into the Montgomery County Jail as of the evening of December 20, 2018." (Doc. #122.)

County for nearly two months outweighed the factors that otherwise might support his request to delay his sentencing.

{¶ 59} Neither did the trial court abuse its discretion by failing to conclude that possible double jeopardy concerns warranted a continuance of Smith's sentencing. Regardless of whether his sentencing in this case went forward, Smith retained the ability to move for dismissal of the subsequently-indicted charges, on which he had not yet been tried, on the basis of double jeopardy. The trial court's denial of his motion to continue sentencing on the original convictions did not infringe his right to the assistance of counsel. For the same reason, the court cannot be said to have abused its discretion by relying "on the statements of the State" urging that double jeopardy would not apply. Given that Smith ultimately pled guilty to at least some of the offenses charged in the later indictment, *see Smith*, Montgomery Cty. C.P. No. 2018 CR 04830, he cannot be said to have suffered any prejudice as a result of the court's denial of his request for a continuance to permit his defense attorney to engage in discovery about a possible double jeopardy defense, which, again, could have been raised in the subsequent prosecution.

{¶ 60} Smith's fifth assignment of error is overruled.

**Assignment of Error #6 – Imposition of Consecutive Sentences**

{¶ 61} Smith's sixth assignment raises three errors allegedly committed by the trial court in making his sexual battery sentences consecutive. Smith first asserts that the trial court engaged in prohibited "sentence packaging" by considering Smith's offenses as "a single group" in order to impose "an omnibus sentence." He next argues that the court erred by imposing consecutive sentences based on his "general course of conduct"

instead of considering only the conduct for which he was convicted. Finally, he contends that his conduct "was the exact same conduct that any person [convicted] of sexual battery necessarily commits," and thus was not "so great or unusual" as to support consecutive sentences.

{¶ 62} In reviewing felony sentences, appellate courts must apply the standard of review set forth in R.C. 2953.08(G)(2), rather than an abuse of discretion standard. *See State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 9. Under R.C. 2953.08(G)(2), an appellate court may increase, reduce, or modify a sentence, or it may vacate the sentence and remand for resentencing, only if it "clearly and convincingly" finds either (1) that the record does not support certain specified findings or (2) that the sentence imposed is contrary to law.

{¶ 63} In general, it is presumed that prison terms will be served concurrently. R.C. 2929.41(A); *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 16, 23 ("judicial fact-finding is once again required to overcome the statutory presumption in favor of concurrent sentences"). However, after determining the sentence for a particular crime, a sentencing judge has discretion to order an offender to serve individual counts of a sentence consecutively to each other or to sentences imposed by other courts. R.C. 2929.14(C)(4) permits a trial court to impose consecutive sentences if it finds that (1) consecutive sentencing is necessary to protect the public from future crime or to punish the offender, (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and (3) any of the following applies:

(a) The offender committed one or more of the multiple offenses while the

offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 64} In ordering that the sentences for Smith's three sexual battery offenses be served consecutively, the trial court strictly adhered to the language of R.C. 2929.14(C)(4), finding consecutive sentences "necessary to protect the public from future crime and to punish [Smith]," and "not disproportionate to the seriousness of Mr. Smith's conduct and to the danger [he] poses to the public." (Tr., p. 498.) Consistent with R.C. 2929.14(C)(4)(b), the court further found "that at least two of the multiple offenses were committed as part of one * * * course of conduct and the harm caused [thereby was] so great or unusual that no single prison term can adequately reflect the seriousness of [Smith]'s conduct." (*Id.*)

{¶ 65} While conceding that the court made the requisite statutory findings, Smith suggests that those findings are unsupported by either the record or existing law. We will examine separately each area in which Smith finds fault with those findings.

*a. Sentence Packaging*

**{¶ 66}** Sentence packaging is "a federal doctrine that requires the court to consider the sanctions imposed on multiple offenses as the components of a single, comprehensive sentencing plan." *State v. Saxon,* 109 Ohio St.3d 176, 2006-Ohio-1245, 846 N.E.2d 824, ¶ 5. In *Saxon*, the Supreme Court of Ohio rejected a sentence packaging approach, finding the federal doctrine to have "no applicability to Ohio sentencing laws." *Id.* at ¶ 10. Under Ohio law, a sentencing court "must consider each offense individually and impose a separate sentence for each offense." *Id.* at ¶ 9. A sentencing court thus "lacks the authority to consider the offenses as a group and to impose only an omnibus sentence for the group of offenses." *Id.* Simply put, sentencing courts in Ohio may not impose a single "lump" sentence for multiple offenses. *Id.* at ¶ 8.

**{¶ 67}** We have held that a trial court may consider whether multiple sentences should be served concurrently or consecutively only *after* the court has "consider[ed] each offense individually and impose[d] a separate sentence for each offense." *State v. Parker*, 193 Ohio App.3d 506, 2011-Ohio-1418, 952 N.E.2d 1159, ¶ 86 (2d Dist.), citing R.C. 2929.11 through 2929.19; *see also State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, paragraph seven of the syllabus; *State v. Mathis*, 109 Ohio St.3d 54, 2006-Ohio-855, 846 N.E.2d 1, paragraph three of the syllabus. Here, the trial court abided by that constraint. Accordingly, the record does not support a conclusion that the trial court imposed "only an omnibus sentence" for Smith's sexual battery convictions in violation of the principle against sentence packaging. *See id.*

**{¶ 68}** In sentencing Smith, the trial court separately stated the sentence imposed for each of his individual offenses before pronouncing that his three sexual battery

sentences would be served consecutively to one another. (*See* Tr., pp. 496-498.) The trial court did not engage in "sentence packaging" merely by advising Smith, before it imposed any individual sentence, that the permissible total sentence for all of the offenses of which he was convicted "range[d] from community control sanctions to a maximum potential term of imprisonment of 15 years." (Tr., p. 495.) Rather, in making that statement, the trial court properly informed Smith of the minimum and maximum possible sentences he faced. Unlike the circumstances in *Parker*, the court did not put forth an improper reason for the length of Smith's combined sentences. *See Parker* at ¶ 96 (where trial court told sexual battery victim that it was imposing lengthy sentence to extinguish "any glimmer of hope" that victim and offender would "wait for" each other); *see also State v. Cameron*, 2d Dist. Clark No. 2012-CA-86, 2013-Ohio-4397, ¶ 18 (distinguishing *Parker* because the trial court in *Cameron* "did not express an improper reason for the sentence it imposed").

{¶ 69} Smith's "sentence packaging" argument is not well taken.

*b. Course of conduct*

{¶ 70} In order to find that two offenses were part of a single course of conduct, a trial court "must * * * discern some connection, common scheme, or some pattern or psychological thread that ties [the offenses] together." (Brackets sic.) (Citation omitted.) *State v. Sapp,* 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, syllabus. Although the term "course of conduct" is not defined in R .C. 2929.14, the Ohio Supreme Court has stated that a course of conduct may be established by factual links, including time, location, weapon, cause of death, or similar motivation. *State v. Short*, 129 Ohio St.3d 360, 2011-Ohio-3641, 952 N.E.2d 1121, ¶ 144, citing *Sapp* at syllabus; *see also State v.*

*Ramey*, 2d Dist. Clark No. 2014-CA-127, 55 N.E.3d 542, 2015-Ohio-5389, ¶ 87.

**{¶ 71}** In addition, "it is well established that the court may consider information beyond that strictly related to the offense(s) of which a defendant is convicted, even including criminal charges and supporting facts that are dismissed under a plea agreement and charges of which the offender is ultimately acquitted." *State v. Summers*, 2d Dist. Darke No. 2013 CA 16, 2014-Ohio-2441, ¶ 15, citing *State v. Bowser,* 186 Ohio App.3d 162, 2010-Ohio-951, 926 N.E.2d 714 (2d Dist.), *State v. Blake,* 2d Dist. Montgomery No. 17355, 1999 WL 375576 (June 11, 1999), and *State v. Wiles,* 59 Ohio St.3d 71, 78, 571 N.E.2d 97 (1991). Although Smith argues that a sentencing court may not consider conduct outside that for which the defendant was convicted, the single case on which he relies for that proposition does not represent the law in this jurisdiction. *See State v. Hale*, 2014-Ohio-262, 7 N.E.3d 643, ¶ 37 (3d Dist.).

**{¶ 72}** Furthermore, this Court has affirmed trial court findings that a defendant's repeated sexual abuse of the same minor victim amounted to a "course of conduct" justifying consecutive sentences. *See, e.g., State v. Moore*, 2019-Ohio-1671, ___ N.E.3d ___, ¶ 68, 71 (2d Dist.) (noting that "the trial court's consecutive-sentencing decision [apparently] was driven largely by what [defendant] did to [victim] over a period of years"); *State v. Barnett*, 2d Dist. Montgomery No. 27660, 2018-Ohio-4133, ¶ 91, 93. We cannot clearly and convincingly find that the record does not support the same result in Smith's case, where the evidence showed that all of Smith's offenses involved his persistence in a series of actions motivated by his desire to pursue a sexual relationship with C.B.

**{¶ 73}** Smith's "course of conduct" argument is not well taken.

*c. "Great or unusual" harm*

{¶ 74} The elements of the three sexual battery offenses of which Smith was convicted are as follows:

(A) No person shall engage in sexual conduct with another, not the spouse of the offender, when any of the following apply:

* * *

(9) The other person is a minor, and the offender is the other person's athletic or other type of coach, is the other person's instructor, is the leader of a scouting troop of which the other person is a member, or is a person with temporary or occasional disciplinary control over the other person.

R.C. 2907.03(A)(9).

{¶ 75} Citing that statute, Smith maintains that the court erred in finding R.C. 2929.14(C)(4)(b)'s consecutive sentence requirements satisfied in his case, because any conviction under R.C. 2907.03(A)(9) necessarily involves a defendant in a "position of trust"[14] and Smith's conduct thus cannot be viewed as "so great or unusual" as to warrant consecutive sentences. That argument misapprehends R.C. 2929.14(C)(4)(b)'s provisions.

{¶ 76} Under the plain language of the applicable statute, the "so great or unusual" factor applies not as to the *conduct* of the defendant, but as to the *harm* caused by such conduct. *See* R.C. 2929.14(C)(4)(b). Consistent with the statutory language, the trial court's specific finding was that "the harm caused by one or more of [Smith's] multiple

---

[14] Smith observes that prior to pronouncing his sentence, the trial court commented on Smith's "eviscerat[ing]" his "position of trust." (*See* Tr., pp. 494-495.) However, the trial court nowhere indicated that it had considered Smith's "position of trust" as a factor in deciding whether to impose consecutive sentences.

offenses [was] so great or unusual that no single prison term can adequately reflect the seriousness of the defendant's conduct." (Tr., p. 498.) Both Mother and C.B. testified about some of the harm that C.B. and her family have suffered as a consequence of Smith's actions. Moreover, given that C.B. was only 14 years old at the time of 41-year-old Smith's offenses, and had been coached by him and been a teammate, classmate, and friend of his daughter since the age of eight, we cannot clearly and convincingly conclude that the record does not support a finding that the harm C.B. suffered was greater or more unusual than that suffered by other "minors" (including those above the age of consent) who may have engaged in sexual conduct with a coach.

{¶ 77} Smith's challenge on this basis to his consecutive sentences is not well taken.

{¶ 78} Because we do not conclude that Smith's consecutive sentences were contrary to law or that the record clearly and convincingly does not support the trial court's consecutive sentence findings, we overrule Smith's sixth assignment of error.

### Assignment of Error #2 – Judicial Bias

{¶ 79} Finally, we consider Smith's contention that he was deprived of his due process right to a fair trial because the trial court was biased against him. In support of that contention, Smith cites "the speech the trial court gave right before it found Smith guilty on all counts":

> Mr. Smith was trusted by a young girl, his own daughter's friends
> [sic], to guide her on a soccer field. He was trusted by her parents to keep
> her safe. He was trusted by the soccer association to use his power and
> authority for good. Simply by being in the role of her coach, he made all of

those promises and for his own personal sexual gratification, he broke them.

Mr. Smith took advantage of the innocence of a child. He broke the trust of her parents who were supposedly his friends and he abused the authority of the position that he had been given and instead of using his role to strengthen the confidence and character of today's young women, Mr. Smith indeed isolated and abused her, one of the very girls he was supposed to protect.

Mr. Smith did, indeed, coach her but not just about soccer. He coached her to lie. He coached her to hide things from her family and coached her to stay silent about his abuses and manipulations.

That kind of coaching is criminal and today the Court is shedding lights [sic] on the darkness of his deeds.

(Tr., pp. 458-459.)[15]

{¶ 80} Smith argues that nothing in the record supports the trial court's conclusions that Smith "isolated" C.B. and "coached" her to lie and stay silent, so such conclusions must have been derived impermissibly "from some 'extrajudicial source.' " He also implies that the trial court's comments indicate the decision in his case was motivated at least in part by the trial judge's desire to further his own election campaign, and urges that the

---

[15] In an act that Smith terms "[e]qually egregious if not more so," a slightly modified version of the same comments allegedly thereafter was posted on a Facebook page bearing the name of the trial judge, who at that time was running for election. Although Smith's appellate brief includes what purport to be links to the Facebook post about which Smith complains and a newspaper article about the judicial election for the common pleas court taking place at that time, we are precluded from considering matters outside the record on this appeal. *See, e.g., State v. Goney*, 2d Dist. Greene No. 2017-CA-43, 2018-Ohio-2115, ¶.60 ("A direct appeal can only refer to evidence in the trial record.").

judgment against him must be reversed. We determine that Smith is not entitled to the relief he seeks.

{¶ 81} "It is well settled that a criminal trial before a biased judge is fundamentally unfair and denies a defendant due process of law." *State v. Dean*, 127 Ohio St.3d 140, 2010-Ohio-5070, 937 N.E.2d 97, ¶ 48, quoting *State v. LaMar,* 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 34, citing *Rose v. Clark*, 478 U.S. 570, 577, 106 S.Ct. 3101, 92 L.Ed.2d 460. The Supreme Court of Ohio has described "judicial bias" as "a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts." *Id.*, quoting *State ex rel. Pratt v. Weygandt*, 164 Ohio St. 463, 132 N.E.2d 191 (1956), paragraph four of the syllabus.

{¶ 82} "[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* at ¶ 49, quoting *Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). Consequently, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Id.*, quoting *Liteky* at 555. However, such remarks *may* support a bias challenge "if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." (Emphasis sic.) *Id.*

{¶ 83} Under Ohio law, the procedure set forth in R.C. 2701.03 provides "the exclusive means by which a litigant may claim that a common pleas judge is biased and prejudiced." *State v. Qualls*, 2d Dist. Montgomery No. 26423, 2015-Ohio-2182, ¶ 7, quoting *Jones v. Billingham,* 105 Ohio App.3d 8, 11, 663 N.E.2d 657 (2d Dist.1995); *see also, e.g., State v. Osie,* 140 Ohio St.3d 131, 2014-Ohio-2966, 16 N.E.3d 588, ¶ 62; *State v. Hudson,* 2d Dist. Clark No. 2014 CA 53, 2014-Ohio-5363, ¶ 25; *State v. Galluzzo,* 2d Dist. Champaign No. 2004-CA-25, 2006-Ohio-309, ¶ 15. "A court of appeals does not have authority to rule on the disqualification of the trial judge *or to void a judgment of the trial court* on that basis." (Emphasis added.) *In re K.B.*, 2d Dist. Montgomery No. 27982, 2018-Ohio-3600, ¶ 21, quoting *Easterling v. Hafer,* 2d Dist. Montgomery No. 24950, 2012-Ohio-2101, ¶ 9.

{¶ 84} The record discloses that Smith did seek through R.C. 2701.03 to have the trial judge disqualified after the court issued its verdict in Smith's case but before the court imposed sentence, advancing the same remarks and actions that form the basis for this assignment of error. (*See* Doc. #130, Affidavit of Disqualification.) The Chief Justice of the Supreme Court of Ohio denied Smith's affidavit of disqualification before the trial court proceeded to sentencing. (Doc. #131 and attached Exh. A); *In re Blaine*, 156 Ohio St.3d 1207, 2018-Ohio-5459, 124 N.E.3d 842. Smith has no remedy available before this Court.

{¶ 85} Furthermore, as the Chief Justice noted in that decision, "[a] judge is presumed to follow the law and not to be biased, and the appearance of bias or prejudice must be compelling to overcome these presumptions." *Id.* at ¶ 6, quoting *In re Disqualification of George*, 100 Ohio St.3d 1241, 2003-Ohio-5489, 798 N.E.2d 23, ¶ 5. Nothing in the record before us suffices to overcome such presumptions. The testimony

of C.B. and Mother, as illuminated by Dr. Miceli's expert testimony regarding "grooming," provided evidence from which the trial court reasonably could infer that Smith had "isolated" C.B. and "coached" her in the areas the court described. There is no indication that the trial court impermissibly relied on "extrajudicial sources" to reach its guilty verdict. Neither does the court's remonstration of Smith in its pre-verdict remarks otherwise evince "such a high degree of * * * antagonism" toward Smith "as to make fair judgment impossible." *See Dean*, 127 Ohio St.3d 140, 2010-Ohio-5070, 937 N.E.2d 97, at ¶ 49. On their face, the trial court's challenged remarks do not venture beyond opinions the judge reasonably may have formed "on the basis of facts introduced or events occurring in the course of the * * * proceedings." *See id.* No compelling evidence of bias appears in the record.

**{¶ 86}** Smith's second assignment of error is overruled.

## Conclusion

**{¶ 87}** For the foregoing reasons, the judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

WELBAUM, P. J. and TUCKER, J., concur.

Copies sent to:

Mathias H. Heck
Heather N. Jans
April F. Campbell
Hon. E. Gerald Parker Jr.